IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Criminal Action No. 08-cr-00365-MSK

UNITED STATES OF AMERICA,

       Plaintiff,

v.

1. **MICHAEL ARTHUR GRIGGS**,
2. **CHARLES HOMER "CHIP" SHARP**,
3. **JUSTIN SHANE BLACKBURN**,
4. **MARK R. TROUDT**,
5. **JASON ALAN CAIN**,
6. **BRETT DAVID HARDING**,
7. PETER T. JENNINGS,
8. **MATTHEW KASKEL**,
9. **GARLAND SCOTT RISDON**, and
10. **DANIEL JOHN TRAVERS**,

       Defendants,

and

DISASTER RESTORATION, INC.,

       Intervenor.

---

**OPINION AND ORDER DENYING MOTION TO RECONSIDER,
DENYING MOTIONS TO DISMISS, AND
GRANTING, IN PART, MOTIONS TO SEAL**

---

**THIS MATTER** comes before the Court on: (i) Defendant Blackburn's Motion to

Dismiss Indictment (**#335**), which Defendants Kaskel (**#336**), Sharp (**#337**), Harding (**#338**),

Cain (**#341**), Travers (**#342**), Risdon (**#356**), and Griggs (**#385**) adopt, and the Government's

Response (**#443**); and (ii) the Defendants' Joint Motion to Dismiss Indictment Due to

Constitutional Errors in Grand Jury Presentation (**#360**), and the Government's Response (**#448**). These motions are collectively referred to as the Motions to Dismiss.  An evidentiary hearing on the motions was conducted over three days, and the Court has considered both the evidence presented and the arguments made by counsel.[1]  The Court has also considered the Defendants' post-hearing brief (**#722**), the Government's Response (**#727**), and the Defendants' Reply (**#733**).

Also pending before the Court are: (i) the Defendants' Motion for Reconsideration (**#721**), pertaining to rulings made during the hearing with regard to a Reply (**#730**) filed by the Defendants, and (ii) various motions to seal (**#359, 398, 449, 471, 700, 705, 723, 728, 735**).

## I.   Jurisdiction

This Court exercises jurisdiction pursuant to 18 U.S.C. § 3231.

## II.   Issues Presented

In the Motions to Dismiss (**#335, 360**), the Defendants request that the Indictment be dismissed due to three types of prosecutorial misconduct: (i) abdication of the prosecutorial responsibilities of the Assistant United States Attorneys ("AUSAs") and Postal Inspector to a private entity, the National Insurance Crime Bureau ("NICB") and its agents; (ii) failure of AUSA Pegeen Rhyne to disclose the participation of NICB in the investigation to the grand jury, coupled with improper testimony by AUSA Rhyne during her presentation to the grand jury; and (iii) violation of the grand jury secrecy rule of Fed. R. Crim. P. 6(e), when AUSA Rhyne

---

[1]  To the extent appropriate, the Court has also considered the evidence presented and the arguments made during an extensive hearing on motions to suppress brought by all of the Defendants, based upon alleged violations during a search of the intervenor's premises.  *See* Transcript of Hearing on Motions to Suppress, filed at **#523, 524, 525**.

disclosed information concerning the grand jury proceeding to an employee of NICB.  The

Government responds that it did not inappropriately delegate its prosecutorial discretion and

denies the alleged misconduct during the grand jury proceedings, but admits that some

information was released in violation of Rule 6(e).  As to this violation, it contends that no

Defendant suffered prejudice as a result of these violations, and therefore dismissal of the

Indictment is not warranted.

### III.   Pertinent Procedural History

This case was initiated by Indictment filed on September 8, 2008.  On October 20, 2008,

the Court authorized the Defendants to receive a copy of the Grand Jury transcript **(#103)**.

A number of scheduling orders have been issued.  The Third Scheduling Order **(#194)**

contained a deadline of March 16, 2009 for filing pretrial motions pursuant to Fed. R. Crim. P.

12(b)(3)(A) and (B), with a response deadline fifteen days following the filing.  On March 9,

2009, Defendant Griggs moved to extend this deadline to April 6, 2009 **(#240)**, which all other

Defendants besides Defendant Troudt joined **(#241, 244, 247, 249, 251, 252, 262)**.  The motions

were granted and the deadline extended to April 6, 2009, with a response deadline of twenty-one

days following the filing of the motion **(#246, 250, 253, 254, 263)**.

On April 1, 2009 **(#295)**, the Court granted the parties' oral motions for a further

extension of time to file pretrial motions other than discovery motions.  The deadline for such

motions was set for April 27, 2009.[2]   The Court set the response deadline for one month later, on

---

[2]  The minutes for this hearing **(#295)** state that the deadline was extended to April 27, 2009 for "[a]ll motions with the exception of 12(b)(3) motions."  However, such minutes contained a clerical error which was later clarified **(#305)**, making all motions other than those filed pursuant to Rule 12(b)(3)(E) due on or before April 27, 2009.

May 27, 2009.

By the deadline, Defendant Blackburn filed the subject motions to dismiss, among others.[3]  An evidentiary hearing on Motions to Suppress **(#148, 307, 329, 332, 380)**[4] began on May 28, 2009 **(#452)**.  It continued on June 25 and 26, 2009 **(#513, 514)**.  The Court orally ruled on the Motions to Suppress on June 29, 2009 **(#517)**.

The Court set an evidentiary hearing on the Motions to Dismiss **(#335, 360)** for August 14, 2009.  Immediately prior to the hearing, the Defendants served a Rule 17 *subpoena duces tecum* on the Government, which the Government moved to quash **(#546)**.  Because the Defendants represented that they could not continue with the hearing without the requested discovery, the hearing was continued.  After the Court ruled on the Motion to Quash **(#581)**, the hearing was rescheduled for April 6, 2010 and April 7, 2010.

During this hearing, the Defendants called Mr. Hersley, Defendant Justin Blackburn, and Inspector Cindy Horton.  The Government called AUSA Rhyne **(#638, 639)**.  The hearing was continued to July 28, 2010 for presentation of any rebuttal evidence.

On July 2, 2010, new counsel for Defendant Cain[5] entered an appearance and filed a Reply **(#698)**[6] to the Government's Response to the Motions to Dismiss.  The Reply not only

---

[3] The Defendants also filed various suppression motions **(#307, 329, 332, 380)**.

[4] The hearing addressed both an existing motion to suppress **(#148)** and later filed motions **(#307, 329, 332, 380)**.

[5] Mr. Cain has been consistently represented in this case by the Federal Public Defender. In April of 2010, after the evidentiary hearing, Assistant Public Defender representing him to that point retired.  Another Assistant Public Defender was assigned to represent him.

[6] All Defendants joined in the Reply.

responded to the Government's arguments, but also added new allegations of additional government misconduct during the grand jury proceedings.  The Government objected to the Court's consideration of the new issues raised in the Reply (**#701**), and the Defendants responded (**#703**).

At the continued hearing on July 28, 2010, the Court sustained the Government's objection to consideration of the new allegations, stating that it would consider the Reply only as it bore on arguments and issues expressly raised in the Motions to Dismiss.  *See* Transcript of Evidentiary Hearing, at 445–46, filed at **#717**.  The Defendants presented the testimony of AUSA Mydans in rebuttal at the hearing, then moved for reconsideration of the Court's earlier ruling that it would not consider new issues raised in the Reply.  *See id.* at 483–90.  The Court denied the motion to reconsider.  *See id.* at 490–91.

### IV.   Material Facts

Based upon the evidence presented, the Court finds the following material facts.

At the times at issue, Disaster Restoration, Inc. ("DRI") was in the business of repairing and restoring property damaged by fire, flood, or other disasters for the benefit of property owners and their insurers.  DRI retained subcontractors to perform the restoration work, submitting the cost of repair bid by its subcontractors to the insurance companies for payment. In addition to the costs charged by its subcontractors, DRI also charged insurance companies twenty percent of the subcontractors' charges—ten percent as an overhead fee and another ten percent as profit.[7]

At all pertinent times, NICB was a not-for-profit organization with insurance company

---

[7]  In the industry this is called "ten-plus-ten."

5

members that conducted investigations into alleged insurance fraud.  Over one thousand

insurance companies belonged to NICB, funding it through memberships fees. Among the NICB

members were insurance companies that were clients of DRI.  During this time, Jon Hersley, a

former agent with the Federal Bureau of Investigation ("FBI"), was employed by NICB to

investigate insurance fraud.

In August 2005, a DRI employee contacted NICB to warn of a possible insurance fraud

scheme conducted by DRI.  Mr. Hersley met with the employee, who explained that DRI was

directing its subcontractors to artificially inflate the bids submitted to insurance companies, and

then paying the subcontractors less than the amount paid by the insurance companies.  This

practice allowed DRI to inflate its profit in two ways.  First, the inflated subcontractor bids

resulted in greater overhead and profit payments to DRI.  Second, DRI retained the difference

between the amounts bid and paid by the insurance companies for the subcontractors' work and

the actual charges of the subcontractors.  The DRI employee provided Mr. Hersley with

numerous DRI documents to support his allegations.

Based on this information, Mr. Hersley initiated an NICB investigation into DRI's

operations.  He met with the employee on at least one other occasion, and was provided with

additional DRI documents.  During this initial investigation, Mr. Hersley also interviewed

subcontractors and reviewed insurance claim files that he received from NICB members.

Having assembled this information, during the fall of 2005, Mr. Hersley contacted United

States Postal Inspector Horton.  Mr. Hersley presented the information to Inspector Horton along

with a request that federal law enforcement agents investigate the matter.  Postal Inspector

Horton expressed interest, but advised Mr. Hersley that her agency was unable to pursue the

investigation because its resources were limited.  She encouraged Mr. Hersley to continue to investigate on behalf of NICB, and to keep her apprised.

Mr. Hersley did just that.  He conducted more interviews of DRI subcontractors and reviewed claim files that he obtained from insurance companies that were members of NICB. He returned to Inspector Horton in January 2006 with a "case presentation."

Inspector Horton again indicated her interest.  On February 17, 2006, she sent a letter to AUSA Tom O'Rourke, Chief of the Criminal Division of the United States Attorney's Office for the District of Colorado, detailing the evidence Mr. Hersley had gathered and giving her assessment of the criminal liability of various people.  Although the letter did not request any specific assistance from the U.S. Attorney's Office, Inspector Horton testified that it was at this point that she considered herself to be officially involved in the investigation of DRI.  She remained unable, however, to personally participate or to direct agency resources to the investigation.  Instead, she encouraged Mr. Hersley and NICB to conduct further interviews.

Mr. Hersley continued to conduct interviews and prepare written summaries that he supplied both to NICB and to Inspector Horton.  He obtained insurance claim files from members of NICB that he subsequently turned over to Inspector Horton.  At her instruction, Mr. Hersley compared the insurance files to subcontractor bids to identify instances where it appeared that there were inflated subcontractor charges.

In spring of 2006, Mr. Hersley (and possibly Inspector Horton) met with AUSA Robert Mydans.  Mr. Hersley and AUSA Mydans were old friends, having previously worked together in Oklahoma when Mr. Hersley was an FBI agent.  During the meeting, Mr. Hersley described the investigation of DRI and its supervision by Inspector Horton.  He asked if AUSA Mydans

would be interested in prosecuting a case against DRI and/or its employees.  AUSA Mydans agreed to consider prosecution of federal charges, and asked to be kept apprised of the investigation as it progressed.  He indicated that he would consider issuing target letters, search warrants, and grand jury subpoenas on an as-needed basis.

At this juncture, Inspector Horton and AUSA Mydans expressly recognized Mr. Hersley's status as a private citizen (as compared to a federal law enforcement officer).  They discussed the fact that his knowledge of and participation in the indictment process would have to be restricted.  With Mr. Hersley, they agreed that he could have no contact with grand jury witnesses, he could not be advised of whether certain witnesses would be or were subpoenaed to testify before the grand jury, and he could not have access to grand jury materials such as grand jury records, transcripts, subpoenas, or documents obtained by grand jury subpoena.

These restrictions did not prevent Mr. Hersley from continuing to investigate, which he did through September 2007 with the knowledge and support of both Inspector Horton and AUSA Mydans.  Mr. Hersley conducted interviews alone, with another NICB employee, or with Inspector Horton.  He requested and obtained claim files from NICB members, met periodically with Inspector Horton to discuss the progress and results of the investigation, and supplied reports of his investigation to NICB superiors, Inspector Horton and AUSA Mydans.  He was also present during interviews conducted by Inspector Horton and various AUSAs.  In particular, he was present during an interview of Defendant Blackburn.  Indeed, Defendant Blackburn testified that during the interview, AUSA Mydans explained that Mr. Hersley was the "reason he [Mr. Blackburn] was there" that day.

On December 7, 2006, the DRI office premises were searched pursuant to a valid

warrant.  Mr. Hersley assisted Inspector Horton in preparing the warrant and her affidavit in

support, and he was one of three NICB employees[8] who assisted seventeen agents of the Postal

Inspector General and a SWAT unit in executing the warrant.

According to the search warrant operation plan, NICB employees were to assist law

enforcement in searching the DRI premises and reviewing the documents located there.  When

the warrant was executed,  Inspector Horton supervised the search, directed one NICB employee

to assist law enforcement officers in obtaining VIN numbers from vehicles, and directing the

others (including Mr. Hersley) to interview certain DRI employees.  Those who were

interviewed by Mr. Hersley testified that he did not disclose that he worked for NICB and that he

operated with the same authority as did the law enforcement officers.  However, Inspector

Horton's testimony that she directed the search and the activities of Mr. Hersley was unrebutted.

At some point during Mr. Hersley's investigation, Inspector Horton began to draft a

proposed indictment.  Although she conferred with Mr. Hersley regarding the counts to include,

the persons to be named in each count, and discussed the timing of the presentation of evidence

to the grand jury, Inspector Horton controlled both the drafting of the indictment and the

interaction with the U.S. Attorney's office.  Inspector Horton directed Mr. Hersley to review

certain insurance documents for support for the counts in the indictment.  Additionally, Mr.

Hersley reviewed the proposed indictment at least three times for factual accuracy.

At some time during the investigation, AUSA Mydans sent "target letters" to various

individuals informing them that they were targets of a grand jury investigation and inviting them

---

[8] The three NICB employees were Mr. Hersley, Mr. Gillen and Mr. Ollila.

to appear before the grand jury.[9]  AUSA Mydans sent copies of some of these letters to Inspector Horton and Mr. Hersley.

In March 2008, Inspector Horton provided AUSA Mydans with a draft indictment.  She suggested that the matter be presented to the grand jury in June 2008.  Mr. Hersley sent an email to AUSA Mydans on May 21, 2008, requesting a meeting with AUSA Mydans and Inspector Horton, and stating "[Inspector Horton] and I would really like to get the case indicted in June or July at the latest.  We think it is important to keep the case moving forward as it will keep the pressure on the defense."  However,  AUSA Mydans did not proceed on the requested timetable; instead, due to caseload considerations, the case was transferred to another AUSA.

In June 2008, AUSA Rhyne became the lead prosecutor.  AUSA Mydans continued in a nominal capacity, but gave very little input into the case.  Inspector Horton and Mr. Hersley met with AUSA Rhyne on June 9, 2008 to apprise her of the case and the state of the investigation.  Although AUSA Rhyne was generally aware of Mr. Hersley's involvement in the investigation, she testified that she did not specifically consider whether Mr. Hersley's employment by NICB gave rise to any bias or animus against the Defendants, but that "If I had felt that Jon Hersley's judgment was tainted, I would have considered that in my review and would have looked at things far more skeptically and would have consulted with a supervisor about that concern."

AUSA Rhyne, however, was aware that Mr. Hersley's private status impacted his access to information pertinent to the grand jury presentation.  For example, during a meeting at which

---

[9]  These letters pertained to anticipated presentations that either were not concluded or did not ultimately occur.  Apparently, a presentation was made in May 2007 to Grand Jury 06-1.  This grand jury's term, however, expired before it considered any indictment in the matter.  Later target letters referred to a date of August 20, 2007, but it does not appear that any proceedings occurred on that date.

grand jury materials were about to be discussed, Mr. Hersley reminded her that he was not a government agent.  As a result, materials subject to Fed. R. Crim. P. 6(e) were not discussed in his presence.  Later, AUSA Rhyne raised the issue with AUSA Mydans.  AUSA Mydans directed AUSA Rhyne to the Tenth Circuit's decision in *United States v. Tager*, 638 F.2d 167 (10th Cir. 1980), which he understood to preclude disclosure of grand jury material to a non-governmental party for purposes of assisting an investigation.

Shortly after the case was assigned to AUSA Rhyne, Inspector Horton provided her with the draft indictment.  AUSA Rhyne reviewed it and the supporting documentation, and determined that more than half of the approximately 125 counts should not be pursued.  She asked Inspector Horton and Mr. Hersley to identify the counts for which there was documentary evidence of differing bids by and payments to subcontractors and to provide her with the documentation for these counts.  In response, Inspector Horton and Mr. Hersley reviewed the indictment and their investigative reports and files, organized the information according to count, and provided it to AUSA Rhyne.

AUSA Rhyne then redrafted the indictment.  During the process, she emailed drafts to Inspector Horton and Mr. Hersley for comment, and periodically contacted one or the other for discussion prior to cutting a particular count.  Although Inspector Horton and Mr. Hersley provided general comments and directed AUSA Rhyne to the documentary evidence, it was AUSA Rhyne who determined what counts to include in the indictment.  In the end, the indictment had far fewer counts than in Inspector Horton's initial version.  Both Inspector Horton and Mr. Hersley reviewed AUSA Rhyne's final draft before it was submitted to the grand jury.

11

AUSA Rhyne began presenting evidence to the grand jury (Grand Jury 07-1) in April 2008. For unknown reasons, however, the presentation was not continued in April. Rather, on July 23, 2008, AUSA Rhyne sent an email to Mr. Hersley and Inspector Horton (with a copy to AUSA Mydans) proposing that the grand jury presentation be concluded on Monday, September 8, 2008. In this email, AUSA Rhyne also addressed strategy with regard to the timing of the arrests of the defendants. Prior to the grand jury presentation, AUSA Rhyne conducted "last chance" meetings with certain defendants which Mr. Hersley attended.

Early in the investigation AUSA Mydans told Mr. Hersley that he would be testifying before the grand jury. However, prior to AUSA Rhyne's presentation to the grand jury in September 2008, AUSA Rhyne informed him that he would not be testifying. Although Mr. Hersley does not recall being told who would testify, he expected that Inspector Horton would testify. On September 4, 2008, AUSA Rhyne emailed Inspector Horton and Mr. Hersley a list of questions that she proposed asking during the grand jury presentation regarding Counts 58 and 59, the Hobbs Act counts against Defendant Sharp. At the time, AUSA Rhyne did not believe that this was material covered by the grand jury secrecy rule of Fed. R. Crim. P. 6(e). She testified that she would not have copied Mr. Hersley on the email if she had thought that the material was covered by Rule 6(e).

AUSA Rhyne continued the presentation to Grand Jury 97-1 on September 8, 2008, during which Inspector Horton was the only witness. During her testimony, she was asked substantially similar questions to those that were emailed to her and Mr. Hersley by AUSA Rhyne on September 4, 2008. During the presentation, AUSA Rhyne (and Inspector Horton) repeatedly referenced Inspector Horton's investigative "team" without revealing that said team

12

included Mr. Hersley, an employee of NICB.  Additionally, while Inspector Horton was

testifying, various grand jurors posed questions.  AUSA Rhyne, and not Inspector Horton,

answered some of these questions.  In particular, the following exchange occurred:

**Grand Juror:** Do we have a total dollar figure on how much they scammed?

**AUSA Rhyne:** We do have an estimate.  And we say it's an estimate because this – it was sort of a painstaking process to calculate this.  And I'll let Inspector Horton explain what that was.

So we can give you the figure we've come up with to date, but there are more documents that we can and will comb through before trial.

**Q (AUSA Rhyne):** So can you explain how you calculated the loss in this case, and then give the total dollar figure you've come up with to date on the loss in this case?

**A (Inspector Horton):** What number we've come up with right now is, like $775,000 plus.  And we came up with that by – the files that I went through her today, we determined what we believed to be the fraud in these files.

And we came up with a number; but during the search, I took out over 200 boxes from this.  And this is just – as you see, it is a very smidgen of what we have.

So if we went to trial, then we would evaluate all the files that are in all the boxes and come up with a complete loss.

**Q (AUSA Rhyne):** And to see if I can clarify the method: Where you have – were able to identify a specific inflated line item, you took the difference between what was paid out and what was billed to the insurance company?

**A (Inspector Horton):** Correct.

**AUSA Rhyne:** So that was the first category of what was calculated as the loss for fraud.

But then on top of that, this ten-and-ten percent was – the ten-and-ten that we've described is the 10 percent overhead and the 10 percent profit that they're entitled to for each job; but our theory is that they're not entitled to that ten-and-ten on top of the fraud they already did.

So for the total quantity of fraud that we have specifically calculated, we added ten-and-ten to that; so that would be the party of the ten-and-ten they weren't entitled to.  Does that make sense?

And so by adding those two together is how we came up with this figure.  Any other questions?

**AUSA Rhyne:** Okay. Can the witness be excused?

13

The grand jury returned the Indictment at 3:22 p.m. on September 8, 2008, the same day as Inspector Horton's testimony.

At some point after the indictment was returned, Mr. Hersley was recommended for a monetary award from NICB for his participation and assistance in the DRI investigation.  It is unclear whether Mr. Hersley ever received the award, the amount of the award, or if Mr. Hersley was aware of this incentive during the investigation.

## V.    Standard of Review

The doctrine of separation of powers demands judicial respect for the independence of both the prosecutor and the grand jury.  *See United States v. Kilpatrick*, 821 F.3d 1456, 1465 (10th Cir. 1987).  Accordingly, dismissal of an indictment for prosecutorial misconduct is an extraordinary remedy and is proper only if there is some "significant infringement on the grand jury's ability to exercise independent judgment."  *See id.*; *United States v. Pino*, 708 F.2d 523, 530 (10th Cir. 1983).  In fact, there is a "presumption of regularity" given to all grand jury proceedings.  *See United States v. Edmonson*, 962 F.2d 1535, 1539 (10th Cir. 1992).  To overcome this presumption, a defendant must show significant misconduct on the part of the prosecutor or other government agents.  *See id.*  Furthermore, even if there has been prosecutorial misconduct, a defendant must further demonstrate that the misconduct either directly prejudiced the defendant, usurped the grand jury's independence or otherwise jeopardized the process so significantly that it threatened a defendant's right to fundamental fairness.  *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 254-57 (1988).[10]

---

[10] The Supreme Court's decision in *Bank of Nova Scotia* dramatically reduced the number of indictments dismissed for prosecutorial misconduct.  *See* Wright & Miller, FEDERAL PRACTICE AND PROCEDURE, § 111.1.

In determining whether to dismiss an indictment for prosecutorial misconduct, this Court engages in a multi-step analysis. It determines first whether there has been prosecutorial misconduct. *See United States v. Lopez-Guitierrez*, 83 F.3d 1235, 1244–45 (10th Cir. 1996); *Kilpatrick*, 821 F.2d at 1466. Black's Law Dictionary (8th ed. 2004) defines "prosecutorial misconduct" as a "prosecutor's improper or illegal act (or failure to act), esp. involving an attempt to avoid required disclosure or to persuade the jury to wrongly convict a defendant or assess an unjustified punishment." In the grand jury context, prosecutorial misconduct can occur when a prosecutor falsely implies that the suspect uses illegal drugs, attempts to bond with grand jurors by providing snacks, leads the grand jury to believe that it is not entitled to request live witness testimony, or violates the provisions of Fed. R. Crim. P. 6.[11] *See Panther v. Hames*, 991 F.2d 576, 582 (9th Cir. 1993); *United States v. Breslin*, 916 F. Supp. 438, 443-46 (E.D. Pa. 1996); *Bank of Nova Scotia*, 487 U.S. at 260–63. In the context of abdication of prosecutorial independence, misconduct occurs when non-governmental personnel "effectively control[] critical prosecutorial decisions." *See Erikson v. Pawnee County Bd. Of County Comm'rs*, 263 F.3d 1151, 1154 (10th Cir. 2001).

If the Court determines that there has been misconduct, it must then determine what type of error resulted – technical/procedural or constitutional. *See, e.g.*, *Lopez-Gutierrez*, 83 F.3d at 1244–45. Neither type of error is precisely defined, but a technical/procedural error generally affects only the grand jury's finding of probable cause. *See id.*; *United States v. Wiseman*, 172

---

[11] Rule 6 governs the grand jury process. In particular, Rule 6(e)(2) provides that proceedings before the grand jury cannot be disclosed except in limited circumstances. Here, violation of Fed. R. Crim. P. 6(e), in addition to ceding prosecutorial discretion, is the basis for the Defendants' Motion to Dismiss in this case.

F.3d 1196, 1205 (10th Cir. 1999).  With this type of error, a defendant must show prejudice for an indictment to be dismissed.  *See Bank of Nova Scotia*, 487 U.S. at 256.  In the grand jury context, prejudice is shown by evidence that the violation "substantially influenced the grand jury's decision to indict" or if there is "grave doubt" that the ultimate indictment was "free from the substantial influence of such violations."  *Id.*  Constitutional errors are those that occur when the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair insofar as the errors are so flagrant, egregious, fundamental or numerous that a defendant's right to a fair criminal process has been jeopardized or where the independence of the grand jury has been usurped.[12]  *See id.*; *Lopez-Gutierrez*, 83 F.3d at 1245. In contrast to technical errors, prejudice is presumed for errors of constitutional magnitude.  *See Bank of Nova Scotia*, 487 U.S. at 256.

In virtually all cases where misconduct is found, prosecutorial misconduct gives rise to a technical/procedural error, and very rarely is there prejudice to a defendant which cannot be cured at trial.  For example, in *Bank of Nova Scotia*, the government gave unauthorized "oaths" to IRS agents appearing before the grand jury, mistreated an expert witness during a recess in the presence of some grand jurors after the witness gave testimony unfavorable to the government, granted "pocket immunity" to 23 witnesses without a court order, and allowed two IRS agents to appear before the grand jury at the same time.  *See Bank of Nova Scotia*, 487 U.S. at 260–62. Although the acts were egregious violations of Fed. R. Crim. P. 6, the Supreme Court held that

---

[12]  In this Court's view, the determination of whether an error is constitutional and the determination of whether the defendant has suffered prejudice as a result of the error often collapses into a single inquiry: whether the errors have influenced the grand jury decision or decision-making process including by intruding on the independence or autonomy of the grand jury.

they did not result in incurable prejudice and could be remedied by sanctions other than dismissal of the indictment.  Even highly offensive conduct, such as the knowing presentation of perjured testimony to the grand jury, has been regarded as a technical/procedural error rather than a constitutional error.  *See United States v. Soberon*, 929 F.2d 935, 940 (3d Cir. 1991).

There are cases, however, in which constitutional error has been recognized.  In *Bank of Nova Scotia,* the Supreme Court gave an illustration of this type of error – racial discrimination in the selection of grand jurors.  The Tenth Circuit has hypothetically recognized other constitutional errors, such as where the government unfairly attempts to sway the grand jury, makes a pervasive attempt to charge a defendant without cause, or substantially compromises the independence of the grand jury.  *See Lopez-Gutierrez*, 83 F.3d at 1245; *United States v. Lin Lyn Trading, Ltd.*, 149 F.3d 1112, 1118 (10th Cir. 1998); *see also Pino*, 708 F.2d at 530.

## VI.   Analysis

### A.   New Allegations of Misconduct first raised in Defendant's Reply Brief

As a preliminary matter, the Court focuses upon the Defendants' Motion for Reconsideration **(#721)** in which the Defendants renew a request that the Court consider new allegations of prosecutorial misconduct during the grand jury presentation that were raised for the first time their Reply **(#698)** to the Government's Response to the Motion to Dismiss.  The new allegations of prosecutorial misconduct raised in the Reply pertain to the lack of correlation between allegedly inflated bids enumerated in the overt acts in the Indictment and the checks issued by the insurance companies as payment to DRI identified in the Indictment's mail fraud counts.

The Defendants' first contention is that AUSA Rhyne misrepresented facts to the grand

jury and failed to provide requested evidence.  This arises from a question posed by a grand juror as to whether each check from an insurance company correlated with a specific overt act.  AUSA Rhyne erroneously answered affirmatively.  However, shortly thereafter Inspector Horton explained that this was not the case.[13]

The second contention is that some of AUSA Rhyne's statements coerced the grand jury, or at a minimum, improperly strayed into their decision-making.  This contention arises from AUSA Rhyne's response to a grand juror's inquiry as to whether the mail fraud counts matched up to the overt acts section of the conspiracy charge.[14]  The Defendants argue the grand juror's specific inquiry and others like it indicated the grand jury's belief that there was insufficient evidence to support the charges in the indictment.  They argue that AUSA Rhyne's answers improperly assured them that the indictment was "okay" or "sufficient" and implicitly promised that if it was inadequate, that the matter would be addressed by the presentation of other evidence at trial.  In essence, the Defendants contend that AUSA Rhyne substituted her promises and assessments for the considered judgment of the grand jury.  The Defendants contend that

---

[13]  Inspector Horton explained "There are some estimates that are - - that the checks relate to that are not listed in the overt acts."  AUSA Rhyne responded by asking "Okay.  So there - - there are some checks - - and we'll get to that - - where we did not put it in the overt acts?", to which Inspector Horton answered "Yes, ma'am."

[14]  In response to the inquiry, AUSA Rhyne stated, "We aren't required to have exact parity between the overt acts and the mail fraud counts.  And I did attempt to get one overt act for each project, but didn't make an attempt to mathematically account for everything that was in the fraud count."  The juror remained confused and AUSA Rhyne further explained "As a legal matter, we only are required to have one single overt act charged for a conspiracy.  So as a legal matter, the indictment is sufficient.  Certainly, I invite any questions when there's confusion; and we'll answer it with the evidence that we have.  And at trial, we'll be presenting this evidence as well.  So I do apologize that its confusing.  Obviously, I didn't anticipate this level of confusion, or I might have drafted it differently.  But as a legal matter, the indictment is okay."

they were prejudiced by these errors because the grand jury requested particular factual information, but never received it, and that they were induced to rely on AUSA Rhyne's representations rather than the evidence presented to find probable cause for the charges in the indictment.

In the current motion (**#721**), the Defendants argue for a third time that the Court should consider the instances of misconduct newly identified in the Reply.  They iterate their prior arguments, and offer new justifications. Although the Court has twice before addressed some of these arguments[15],  it now takes this opportunity to reconsider[16] and to further explicate its reasoning.

The Defendants argue that the Motion to Dismiss articulated a general contention of

---

[15]  Among these are Defendant's arguments that because the Court must consider the entire grand jury transcript in conjunction with the arguments raised in the Motion to Dismiss, it might as well consider newly identified instances of misconduct because no new evidence is necessary, and that the newly raised issues are of constitutional importance.

[16]  Because there is no federal criminal rule directly governing motions for reconsideration, many courts, including those in this district, apply the standards used in civil cases.  *See, e.g.*, *United States v. Matlack*, 2010 WL 2682110, at *1 (D. Colo. Jul. 1, 2010) (unpublished); *United States v. D'Armond*, 80 F.Supp.2d 1157, 1170 (D. Kan. 1999).  Under these standards, only limited grounds warrant reconsideration:  (i) an intervening change in controlling law; (ii) new evidence previously unattainable; and (iii) the need to correct clear error or prevent manifest injustice.  *See Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  A motion to reconsider is appropriate when the party alleges that the court has misapprehended the facts, a party's position, or the controlling law, but it is not a tool to be used rehash previously-presented arguments already considered and rejected by the court, nor to present new arguments based upon law or facts that existed at the time of the original argument. *See FDIC v. United Pacific Ins. Co.*, 152 F.3d 1266, 1272 (10th Cir. 1998); *Van Skiver v. United States*, 952 F.2d 1241, 1243-44 (10th Cir. 1991).  Here, the Defendants do not contend that there has been an intervening change in the law, new evidence that previously was unattainable, or the need to correct clear error.  The Court understands their justification for further reconsideration to be based on the desire to avoid manifest injustice.

prosecutorial misconduct and that the newly identified instances of misconduct are merely

additional examples.  In essence, the Court understands this argument to be that in referring to

the grand jury transcript in the Motion to Dismiss, the Defendants were putting the Government

on notice of "any and all" possible misconduct that could be reflected in it, even if not

specifically identified by the Defendants.  The corollary to this contention is that the Defendants

were free to identify specific misconduct that occurred during the grand jury hearings at any time

after filing the motion.  In addition, the Defendants complain that procedural formalities, such as

filing deadlines and notice requirements, should not deny them the opportunity to raise important

constitutional issues.

Because it is undisputed that the Reply raises new instances of alleged misconduct not

previously identified, the procedural context surrounding the filing of the Reply as well as the

requirements of a motion to dismiss for prosecutorial misconduct are both important to the

consideration of the Defendants' Motion.  As noted in the procedural history, *supra*, the Motions

to Dismiss and Responses thereto were filed in accordance with the court-set deadlines.  No

authorization to file a Reply was sought nor obtained.  No request to extend the time for bringing

motions to dismiss was made after the deadline of April 27, 2009.  No motion for relief from the

provisions of Fed. R. Crim. P. 12(e) has been made.  The filing of the Reply was unauthorized

and made after both the Defendants and the Government had rested in the presentation of their

evidence in opposition to the Motions to Dismiss.

Contrary to the assertions of the Defendants, their Motions to Dismiss are limited to the

specific instances of alleged misconduct identified in them.[17]   Neither the Motions to Dismiss nor

the attachment of the transcript of the grand jury proceedings as an exhibit to the Motions could

or did put the Government on general notice that other conduct during the grand jury

presentation would be challenged.  By logical extension, because the evidentiary hearing was

limited to the instances of alleged misconduct identified in the Motions to Dismiss, the

admission of the grand jury transcript at the hearing opened no door to new allegations.

Accordingly, both because the Reply identifies new allegations of misconduct and

because no filing of a Reply was authorized,[18] it operates as a new Motion to Dismiss.  The filing

and disposition of such a motion is governed by Fed. R. Crim. P. 12, which provides in

subsections  (b)(3)(A) and (B), that motions alleging "a defect in instituting the prosecution" or

"a defect in the indictment or information" be filed by a deadline set by the Court.  Rule 12(e)

further provides that if such motions are not filed by such deadline, they are waived.

Additionally, Rule 12(e)'s waiver provision applies not only to the failure to make a pretrial

---

[17]   As explained more fully *infra*, failure to raise a particular argument in a pretrial motion prior to the court's deadline for such motions results in waiver of that argument.  *See United States v. Hamilton*, 587 F.3d 1199, 1213 (10th Cir. 2009); *United States v. White*, 584 F.3d 935, 949 (10th Cir. 2009); *United States v. Dewitt*, 946 F.2d 1497, 1502 (10th Cir. 1991). This is in line with the general requirement that a proponent of a motion must set forth specific facts on which he or she bases the requested relief.  *See Wagner*, 581 F.3d at 416 (holding that to exhaust a claim in state court prior to bringing a petition for writ of *habeas corpus*, a petitioner must set forth both the specific legal and factual basis for the claim to the state court); *Boone*, 972 F.2d at 1554 n.6 (holding that a plaintiff's mere mention of an undefined constitutional claim in the opening brief of a civil appeal was not sufficient to raise the issue on appeal even though the issue was spelled out in the reply brief).

[18] Defendants have not identified any provision in Fed. R. Crim. P 12, any identified Local Rule of this Court, or any Order entered in this case that authorizes the filing of a reply to a pretrial motion as a regular practice or specifically to the Motions to Dismiss.

motion, but also the failure to include a particular argument in the motion. *See Hamilton*, 587

F.3d at 1213; *Dewitt*, 946 F.2d at 1502. To avoid waiving an argument, the party must make

"sufficiently definite, specific, detailed and nonconjectural factual allegations supporting" his

or her claim. *See White*, 584 F.3d at 949. In the event that the waiver does operate to preclude a

claim, upon a showing of good cause, a court may grant relief from the waiver. *See* Fed. R.

Crim. P. 12(e).

The last deadline for filing a Motion to Dismiss was April 27, 2009. No extension of

this deadline was requested nor granted. Thus, the filing of the Reply on July 2, 2010 was

untimely by more than 14 months. In the absence of an extension of time, by operation of Rule

12(e), the new arguments raised in the Reply were waived. This waiver could arguably be

abated by a showing of good cause,[19] but none has been made.

The Defendants have offered no explanation[20] for their delay in asserting of prosecutorial

conduct arising in the grand jury proceedings. All of the counsel representing the Defendants are

experienced criminal practitioners well advised in both the applicable law and procedure. They

were first provided access to the grand jury transcript in October 2008, approximately 6 months

before the deadline for filing motions to dismiss. There has been no suggestion that they had

---

[19] Relief under the narrow exception in Rule 12(e) is rarely given. *See United States v. Batista*, 239 F.3d 16, 19 (10th Cir. 2001). Relief is appropriate only when there is a showing of cause for the delay and prejudice resulting from the failure to raise the issue. *See id.*

[20] In the absence of any explanation, the Court infers that the impetus for the filing of the Reply was the assignment of a new attorney by the Federal Public Defender's office to Defendant Cain. The event that precipitated this new assignment was the retirement of counsel who had represented him throughout this case and who, like all other counsel representing all of the other Defendants in this case, joined in the Motion to Dismiss. Although new counsel may bring a new perspective to the case and the pending motions, such new perspective, alone, does not constitute good cause for raising issues out of time.

inadequate time to review the transcript or consider the legal arguments that might be made based upon it.

The Court finds the Defendants' contention that being deprived of the opportunity to make new arguments for dismissal is a rigid and unfair elevation of procedure over substance to be particularly unpersuasive in these circumstances.  There were several procedural avenues open to the Defendants to avoid this result, but they have not availed themselves of the opportunity for relief.  In addition, none of the cases that Defendants rely upon to suggest leniency are apt; all concern procedural rulings affecting trial rights.[21]  Here, the Defendants will have a trial at which they can argue about any deficiency in the evidence[22] presented  by the

---

[21]  *See Davis v. Alaska*, 415 U.S. 308 (1974) (accused's right of confrontation was superior to the State's policy of protecting the confidentiality of a juvenile witnesses' criminal record under the particular circumstances of the case); *Chambers v. Mississippi*, 410 U.S. 284 (1973) (accused was denied a fair trial when he was not permitted to cross-examine his own hostile witness); *Rock v. Arkansas*, 483 U.S. 44 (1987) (State's *per se* rule of excluding all hypnotically refreshed testimony infringed on an accused's right to testify her own behalf); *Holmes v. South Carolina*, 547 U.S. 319 (2006) (accused's right to present a complete defense was violated by the application of an evidence rule excluding evidence of third party guilt if there was forensic evidence strongly supporting a guilty verdict).

[22]  Assuming, without determining, that the new allegations constitute prosecutorial conduct, it appears that the violations would be technical rather than constitutional and that prejudice in the issuance of the Indictment has not been shown.  The alleged misstatement by AUSA Rhyne was corrected both by Inspector Horton and by AUSA Rhyne.  There is nothing in the transcript to suggest that the grand jury did not perceive or appreciate the correction.  The statements by AUSA Rhyne that the Indictment was "okay" and "sufficient" are more troubling, but the context could lead to two interpretations.  Either they could be understood as comments about the legal sufficiency of the Indictment itself, or as comments as to the sufficiency of the evidence presented as argued by the Defendants.  It is beyond the purview of this Court to speculate as to the thoughts of the grand jurors, but their persistent questioning about the correlation between bids and checks suggests that they did not understand AUSA Rhyne's comments to dispose of their obligation to assess the evidence.  Giving deference to the regularity of the grand jury process and the grand jury's adherence to its duty, it would appear that the jurors were aware of deficiencies in the evidence presented but nevertheless found probable cause to charge the Defendants.

Government.

Upon reconsideration, the Court finds no reason to depart from its earlier determinations. The motion to reconsider is **GRANTED**, insofar as the Court has reconsidered its earlier ruling, but upon such reconsideration, the Court continues to decline to consider alleged instances of prosecutorial misconduct newly-raised in the Defendants' untimely-filed Reply.

**B.    Issues raised in the Motions to Dismiss**

**1.    Abdication of Prosecutorial Discretion and Independence**

The Defendants' first argument concerns the extensive role that Mr. Hersley played in the investigation and decision to prosecute.  The Defendants contend that the Government inappropriately delegated its prosecutorial discretion and independence to Mr. Hersley and NICB.  They argue that the evidence shows that Mr. Hersley investigated and otherwise acted at the direction and for the benefit of his employer, NICB, and used the information that he obtained and his contacts and knowledge of federal law enforcement to instigate the prosecution of this case.  More importantly, they contend that Inspector Horton and AUSAs Mydans and Rhyne lost sight of Mr. Hersley's status as a private citizen and  improperly deferred to him in making critical decisions in the case.

The Government admits that Mr. Hersley and NICB were substantially involved in the investigation process, but argues that prosecutorial discretion was not improperly ceded to Mr. Hersley or NICB because Inspector Horton and AUSAs Mydans and Rhyne retained control and decision-making authority over the process at all times.

Prosecutors hold a unique position in the United States criminal legal system because they are obligated not only to advocate for the Government's interest but also must seek a fair

and just result.  *See Berger v. United States*, 295 U.S. 78, 88 (1935).  One prosecutorial

responsibility is to ensure impartial application of the law.  This requires prosecutors to

investigate, assess information and make decisions without consideration of the desires of

private parties.  If non-governmental personnel "effectively control critical prosecutorial

decisions" the impartiality and legitimacy of the prosecution is threatened, and a defendant's

right to due process can be abridged.  *See Erikson v. Pawnee County Bd. Of County Comm'rs*,

263 F.3d 1151, 1154 (10th Cir. 2001).[23]  Critical prosecution decisions include whether to

prosecute, who to prosecute, what investigative powers to utilize, and what penalties to seek,

plea bargains to strike, or immunities to grant.[24]  *See id.*

Mr. Hersley's involvement in the investigation of DRI was extensive.  He combined his

experience as a former F.B.I. agent with the resources and contacts of NICB to gather

information, conduct interviews, and package the information in a way that would appeal to a

---

[23]  In *Erikson*, Mr. Erikson was prosecuted for shooting and killing two men on his property.  After two trials, which resulted in an acquittal as to the death of one victim and a hung jury regarding the death of the other victim, the defendant brought an action pursuant to 42 U.S.C. § 1983.  He alleged that the Oklahoma Sportman's Association, the president of that association, and Mr. Turpen, the attorney for the victims' families, had raised money to provide the prosecutor with "research assistants and investigators" in order to prosecute the case. On appeal, the Tenth Circuit held that no constitutional violation had been shown because there was no showing that the private parties that allegedly funded the investigation had exercised control over any critical prosecutorial decision.

[24]  The Defendants rely heavily on *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 809 (1987), in which the Supreme Court held that it was fundamental error for the district court to appoint a special prosecutor in a contempt proceeding when such person had an interest in the outcome.  The reasoning of the opinion demonstrates the underlying obligation of a prosecutor to be impartial, but that decision offers little more in the context of this case.  In *Young,* the appointed prosecutor operated without supervision or input from any impartial party.  Thus, all of the critical prosecutorial decisions were tainted by the special prosecutor's bias.   In this case, however, assuming a bias on Mr. Hersley's part, he neither worked alone nor made the critical prosecutorial decisions.

prosecutor.  He utilized his contacts within the U.S. Attorney's office and arguably elected to approach the Postal Inspector's office, as compared with other investigative agencies, based on a belief that the Postal Inspector's standards governing investigations were more favorable to him. Once he obtained Inspector Horton's interest, he willingly continued investigating at her direction, thereby minimizing the need for her personal involvement or a substantial commitment of her agency's resources.

Mr. Hersley also was involved in the actions taken by governmental entities.  He participated in the December 2006 search of the DRI office premises, interviewed DRI employees, and reviewed the evidence seized in the search.  He participated in interviews conducted by government agents and attorneys, assembled and analyzed the information gathered for preparation of an indictment, discussed and reviewed indictment drafts, and participated in "Rule 11" and "last chance" meetings with some of the Defendants in this case.  It is also fair to say that, although he used his law enforcement skill and experience in these activities, Mr. Hersley was at all times pursuing the private objectives of his employer, NICB.

The Court fully appreciates the skepticism and distrust that Mr. Hersley's involvement in this case has caused the Defendants.  The combination of NICB's objectives and Mr. Hersley's extensive role in the investigation and preparation of the case for prosecution has created the appearance that a private person (or private entity) can influence public servants charged with enforcing the law.  It raises fears that the government investigators and prosecutors will not make decisions based on an impartial assessment of law and facts, but instead can be directed by a private party with personal objectives - profit, revenge or the like.

The question of whether this reflects prosecutorial misconduct, however, turns upon **who**

**exercised control of prosecutorial decisions**.  If Mr. Hersley controlled the decision-making, then the Government has not performed its neutral and unbiased deliberative function, and the Indictment must be dismissed. On the other hand, if, despite his involvement in the investigation and his private motives for such involvement, Mr. Hersley did not make or control the critical prosecutorial decisions, then dismissal is not warranted.

Having carefully reviewed the evidence presented, the Court finds that despite his extensive involvement in the pre-indictment phases, Mr. Hersley did not make or control the critical prosecutorial decisions.  Inspector Horton provided supervision and direction of Mr. Hersley's investigation after she considered herself to be involved.  She decided to submit the investigation  to the United States Attorney, provided the affidavit and obtained the search warrant for the search of the DRI premises, directed and supervised the search, prepared drafts of the indictment, and issued subpoenas for the grand jury presentation.  AUSA Mydans issued target letters and initially decided to present the matter to the grand jury.  Once she took over the case, AUSA Rhyne reviewed the investigation results, assessed the counts that could be brought, redrafted the indictment, and decided what evidence to present to grand jury.  She ultimately determined what charges to pursue and presented those to the grand jury.  Although Mr. Hersley initiated the investigation and assisted Inspector Horton, AUSA Mydans, and AUSA Rhyne, each governmental actor retained and exercised his or her decision-making authority.  Although the Court is reluctant to condone the practice of relying upon private parties to engage in such extensive investigation and preparation of a case for prosecution – as it creates doubts as to the independence of the prosecution – the evidence does not establish that the key prosecutorial decisions were made by anyone other than those empowered to do so.  Accordingly, the Motion

to Dismiss is **DENIED** on this ground.

### 2.    Grand Jury Misconduct

The Defendants also seek dismissal based upon alleged misconduct by AUSA Rhyne during the grand jury proceeding.  They contend that she violated the grand jury secrecy rule of Fed. R. Crim. P. 6(e) prior to the actual grand jury presentation, made unsworn statements to the grand jury, and misled the grand jury.

Before addressing the Defendants' arguments, it is helpful to reflect upon the purpose and function of the grand jury process.  The Fifth Amendment to the United States Constitution requires that, except in limited circumstances, "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury[.]"  The grand jury is modeled after its English progenitor, which was independent of the Crown and the courts.  *See Costello v. United States*, 350 U.S. 359, 362-63 (1956).  Composed of members of the public, the grand jury serves the dual function of (1) determining whether there is probable cause to believe that a crime has been committed, and (2) protecting citizens against unfounded criminal prosecutions.  *See United States v. Sells Eng'g, Inc.*, 463 U.S. 418, 423 (1983).  Although a court convenes the grand jury, administers an oath to the jurors, and instructs members as to their role, it does not supervise the grand jury during its investigative and deliberative processes.  *See United States v. Williams*, 504 U.S. 36, 47 (1992).  Instead, the grand jury acts independently to investigate and determine whether probable cause exists to believe a crime has been committed.  If it finds probable cause, it returns an indictment.  *See Sells Eng'g*, 463 U.S. at 423.  Although it is independent, a federal grand jury depends upon the assistance of the United States Attorney to bring  matters to its attention of the grand jury and presents

28

evidence for its consideration.  The United States Attorney also advises the grand jury on the

governing law, which enables the grand jury to determine whether the law has been violated.

*See Sells Eng'g*, 463 U.S. at 430.

The proper functioning of the grand jury system depends on the secrecy of its

proceedings.  *See Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218–19 & n.10 (1979).

Secret proceedings promote the willingness of witnesses to testify and help ensure full and frank

testimony, avoid pre-indictment warning to a defendant, discourage witness and juror

intimidation or tampering, and protect the public reputation of those who are exonerated by the

grand jury.  *See id.*  Ordinarily, grand jury secrecy may not be broken except upon a

particularized showing of  "compelling necessity."  *See United States v. Proctor & Gamble Co.*,

356 U.S. 677, 682 (1958); *United States v. Tager*, 638 F.2d 167, 168 (10th Cir. 1980).

### a.    Alleged Breach of Grand Jury Secrecy

As noted *supra*, the Defendants contend that AUSA Rhyne violated Fed. R. Crim. P. 6(e)

when she disclosed the draft indictment to Mr. Hersley and emailed him regarding proposed

questions for Inspector Horton's testimony before the grand jury.  The Defendants also argue

that Mr. Hersley's intimate involvement in the case allowed him access to information covered

by Rule 6(e).

The Government concedes that there were likely limited violations of Rule 6(e) with

respect to AUSA disclosure of questions to Mr. Hersley, but contend that dismissal of the

Indictment is not warranted because the Defendants have not demonstrated that any prejudice

resulted.  The Government further argues that outside the limited violations, Mr. Hersley's

involvement in the investigation, including his participation in drafting the indictment, did not

constitute a Rule 6(e) violation, but, if it did, there is no prejudice.

Fed. R. Crim. P. 6(e)(2)[25] provides that certain persons, including an attorney for the government, "must not disclose a matter occurring before the grand jury."  There are certain exceptions to this rule: (i) grand jury proceedings can be disclosed to an attorney for the government for use in performing that attorney's duty; (ii) proceedings can be disclosed to any government personnel—including those of a state or state subdivision, Indian tribe, or foreign government—that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law; or (iii) disclosure may be made to a person authorized by 18 U.S.C. § 3322, which is not applicable here.

A violation of Rule 6(e) may justify dismissal of an indictment if the violation equates to an abuse of the grand jury process.[26]  In determining whether dismissal is appropriate, the focus

---

[25]  Fed. R. Crim. P. 6(e)(2) provides:
(2) Secrecy.
    (A) No obligation of secrecy may be imposed on any person except in accordance with Rule 6(e)(2)(B).
    (B) Unless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury:
        (i) a grand juror;
        (ii) an interpreter;
        (iii) a court reporter;
        (iv) an operator of a recording device;
        (v) a person who transcribes recorded testimony;
        (vi) an attorney for the government; or
        (vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii).

[26] With regard to the Government disclosing grand jury material to private citizens, the lead case in the Tenth Circuit is *United States v. Tager*, 638 F.2d 167 (10th Cir. 1980).  Although some of the facts of *Tager* are quite similar to those presented in this case, the opinion is not instructive on the question of when violations of Fed. R. Crim. P. 6(e) should result in dismissal of an indictment.

In *Tager*, an investigator working for a private group representing insurance companies

of the Court's inquiry is on the grand jury's process and independence, rather than on the propriety of the Government's actions.  *See United States v. Kilpatrick*, 821 F.2d 1456, 1469 (10th Cir. 1987); *United States v. Kabbaby*, 672 F.2d 857, 863 (11th Cir. 1982); *United States v. Malatesta*, 583 F.2d 748, 753 (5th Cir. 1978).  In other words, dismissal of an indictment is not warranted unless the violation of Rule 6 substantially influenced the grand jury's decision to indict.  *See United States v. Fowlie*, 24 F.3d 1059, 1066 (9th Cir. 1994) (considering violations of Rule 6(d)).

Fed. R. Crim. P. 6 does not define "matter occurring before the grand jury."  Generally, the rule is intended to protect only against disclosures "of what is said or what takes place in the grand jury room."  *See United States ex rel. Woodard v. Tynan*, 757 F.2d 1085, 1087 (10th Cir. 1985).  However, the term has also been interpreted to incorporate matters that reveal the identities of the witnesses or jurors, the substance of the testimony, the strategy or direction of the investigation, the deliberations or questions of the jurors, and other similar information.  *See Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 870 (D.C. Cir.

_____

investigated an insurance fraud scheme and brought the results to the Postal Inspector.  At the Postal Inspectors request, the investigator developed the case.  When the grand jury was convened, the Postal Inspector obtained judicial approval to disclose the grand jury material to the investigator, under the exception allowing for disclosure in relation to a judicial proceeding. The investigator reviewed the grand jury transcripts.

One of the defendants moved to dismiss the indictment for violations of Rule 6(e).  The trial court denied the motion, but noted its concern that the material was not appropriately disclosed under Rule 6(e).  On appeal, the primary issue before the Tenth Circuit was whether the disclosures were properly made under Rule 6(e).  The Tenth Circuit first determined that the only possible provision permitting disclosure was the provision authorizing a court to order disclosure "in connection with a judicial proceeding."  Ultimately, the Court concluded that the grand jury proceeding itself did not qualify as a judicial proceeding and, therefore, the disclosure was not authorized by Rule 6(e).  Accordingly, the Court reversed and remanded for further consideration.

1981); *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1382 (D.C. Cir. 1980).

It is undisputed that during the grand jury proceedings, AUSA Rhyne mistakenly copied Mr. Hersley on an email that contained the questions that she intended to ask Inspector Horton. Assuming, without deciding, that such questions were grand jury materials subject to Rule 6(e), the Court finds that the violation was of limited scope and import. The record reflects no evidence demonstrating that the information was used by Mr. Hersley or anyone else to affect the grand jury proceedings. Moreover, the questions only related to Counts 58 and 59, Hobbs Act charges against Defendant Sharp, that have since been dismissed **(#517)**. Because there is no apparent impact or prejudice resulting from the disclosure, dismissal is not warranted on this ground.

The Defendants also argue that Mr. Hersley's intimate involvement in the investigation and preparation of the case revealed to him what occurred or was likely to occur before the grand jury. This argument is based upon caselaw in which disclosure of information or documents not actually presented to the grand jury has been deemed to violate of Rule 6(e) because the disclosure revealed what transpired before the grand jury, *i.e.*, identities of the witnesses or jurors, the substance of the testimony, the deliberations or questions of the jurors, and other similar information. *See Anaya v. United States*, 815 F.2d 1373, 1379 (10th Cir. 1987); *Martin v. Consultants & Admrs.*, 966 F.2d 1078, 1097 (7th Cir. 1992); *see also Fund for Constitutional Gov't*, 656 F.2d at 870; *Dresser Indus., Inc.*, 628 F.2d at 1382. Under this line of cases, the Court first determines "whether revelation in the particular context would in fact reveal what was before the grand jury." *See Anaya*, 815 F.2d at 1379. For purposes of analysis in this case, the Court will assume, without deciding, that Mr. Hersley's familiarity with the investigation and

32

preparation of the indictment gave him particular insight into what AUSA Rhyne intended to present to the grand jury.

Then, to determine whether dismissal is appropriate for the violation of Rule 6(e), the Court determines whether and how the revelation of such information affected the grand jury process, *i.e.*, was the grand jury's independence and process usurped. *See e.g.*, *Kilpatrick*, 821 F.2d at 1469. Many violations of Rule 6(e) do not lead to such a result. For example, in *Kilpatrick*, the Tenth Circuit concluded that although the prosecutors had violated Rule 6(e) by, *inter alia*, disclosing grand jury documents to civil Internal Revenue Service personnel for indexing and sending letters to the business associates of the defendants identifying the subject and targets of the investigation, dismissal was not warranted because the disclosures did not affect the grand jury's independence. *See id.*, 821 F.2d at 1471–72. In *Kabbaby*, the Eleventh Circuit concluded that although it may have been a technical violation of Rule 6(e) to disclose the transcripts from a previous grand jury presentation to a separate grand jury (which ultimately returned the indictment), the violation was not grounds for dismissal of the indictment because there had been no showing that the violation resulted in an abuse of the grand jury process. *See Kabbaby*, 672 F.2d at 863. Under similar facts, the Court in *Malatesta* also concluded that the violation did not warrant dismissal because the disclosure of the prior transcripts "did not impair any substantial rights of the defendants or impugn the integrity of the grand jury proceedings." *Malatesta*, 583 F.2d at 753.

In this regard, the significance of the information known to Mr. Hersley is similar to the list of questions that AUSA Rhyne intended to ask Inspector Horton. There is no suggestion in this record that Mr. Hersley's knowledge was used to influenced AUSA Rhyne's preparation or

33

presentation to the grand jury, that he attempted in any way to interfere with or influence its consideration, or that his knowledge of the investigation in fact had any influence or effect on the grand jury's process or ultimate finding of probable cause.  AUSA Rhyne alone was responsible for determining the witnesses to be called and the evidence to be presented to the grand jury, and it was she who presented such evidence.

Returning to the purposes of grand jury secrecy, it is hard to see how Mr. Hersley's knowledge of the facts learned in the investigation prejudiced the grand jury's function.  He obtained the information while assisting the Government.  Many complaining victims and witnesses have information that they turn over to or learn about during a criminal investigation, and such information may cause them to speculate as to what witnesses and evidence will be presented before the grand jury.  Simply knowing what information the government has obtained in its investigation does not frustrate the grand jury process.  Absent evidence that the information was improperly obtained or that it was used to prejudice the operation of the grand jury, the Court finds no justification for dismissal.

### b.      Misconduct During the Grand Jury Proceeding

Finally, the Defendants seek dismissal based upon the allegation that AUSA Rhyne misled  the grand jury by consistently referring to Inspector Horton's investigative "team" without disclosing that the "team" included  NICB employees, *i.e.*, private parties seeking prosecution of the alleged insurance defrauders.  The Defendants also contend that it was misconduct for AUSA Rhyne to answer certain questions that were posed by the grand jurors to Inspector Horton, when she was unsworn as a witness.  The Government responds that these arguments are essentially arguments challenging the sufficiency of the evidence, which is not a

grounds for dismissal of the Indictment, and that even if these did amount to misconduct, there has been no showing of the prejudice necessary to support dismissal.

As noted *supra*, there is a "presumption of regularity" given to all grand jury proceedings. *See Edmonson*, 962 F.2d at 1539. If, an indictment is valid on its face, it is not subject to challenge based on "the reliability or competence of the evidence presented to the grand jury." [27] *See Bank of Nova Scotia*, 487 U.S. at 261. To overcome this presumption, a defendant must show significant misconduct on the part of the prosecutor or other government agents. *See id.*

It is undisputed that AUSA Rhyne and Inspector Horton referred to Inspector Horton's "team" without further elaboration or identification. The Court understands the Defendants' objection to be that this reference implied a "law enforcement team" from which one would expect impartiality in investigation and review of the evidence. In actuality, an important component to Inspector Horton's "team" was Mr. Hersley, who was not impartial and presumptively had a bias toward prosecution.

The Court has serious doubt as to whether this reference constitutes misleading information and therefore prosecutorial misconduct. The word "team" is not used in a context that suggests that it was intended to convey a particular and precise meaning, much less a meaning that was misleading. It appears to be used simply to refer to people other than Inspector Horton, in order to convey that she did not have personal knowledge of all of the details of the

---

[27] Even if cast as an incomplete or misleading presentation, challenges to the quality or quantity of evidence presented to the grand jury do not constitute grounds for dismissal. *See Costello*, 350 U.S. at 363; *Williams*, 504 U.S. at 54–55.

investigation.  Even with the Court's knowledge of all of the participants in the investigation, the word reasonably could be understood to refer both to other government agents and to employees of NICB.  Thus, the question becomes whether a prosecutor must divulge to the grand jury the identity of all persons who participated in an investigation, or alternatively the identities of those private parties who assisted in the investigation.  The Defendants offer no law for this proposition, and the Court is reluctant to retrospectively impose such obligation.

The essence of the prosecutor's obligation is to assess and present evidence.  As testified to by AUSA Rhyne, if she had believed Mr. Hersley's bias affected the quality of information obtained in the investigation, she would have given it greater scrutiny.  But there is no evidence in the record to suggest that Mr. Hersley's or NICB's desire to see a criminal prosecution affected the reliability of the evidence that was unearthed or presented to the grand jury. Therefore, the Court finds no misconduct by the prosecutor and no prejudice to the process.

Similarly, AUSA Rhyne's unsworn statements to the grand jury, although improvident, did not amount to misconduct.  The statements were made in conjunction with sworn testimony by Inspector Horton and were limited to the fact that the Government included the "ten-plus-ten" amounts, *i.e.*, the ten percent profit and ten percent overhead that DRI added to each of its jobs, in its calculation of loss.  AUSA Rhyne's testimony did not establish that the "ten-plus-ten" as fact; rather it merely explained the procedure by which the Government totaled the final loss amount, *i.e.*, that the ten-plus-ten amount was added to the sum of the inflated bids.  Even if considered to be misleading, there is no evidence that this comment prejudiced the grand jury's decision making in any way.

Accordingly, dismissal is not warranted based on AUSA Rhyne's conduct during the

grand jury presentation and the Motion to Dismiss is **DENIED** on this ground.

### C.     Motions to Seal

In the motions currently before the Court, the parties seek to seal various filings because they contain grand jury material.  In particular, the parties seek to seal the filings (i) related to the Defendants' Motion to Dismiss for Errors in Grand Jury Proceedings (**#360**); (ii) related to Defendant Blackburn's Motion to Disclose Grand Jury Material (**#399**), which pertains to the motion to dismiss the indictment; and (ii) related to the parties' post-hearing briefs (**#722, 727, 733**) regarding the Motions to Dismiss.  The justification offered for sealing is compliance with the secrecy requirements of Fed. R. Crim. P. 6(e).

Generally, the public enjoys the right of access to judicial records.  *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 597 (1978).  This right is premised upon the recognition that public monitoring of the courts fosters important values such as respect for the legal system. *See In re Providence Journal Co.*, 293 F.3d 1, 9 (1st Cir. 2002).  Judges have a responsibility to avoid secrecy in court proceedings because "secret court proceedings are anathema to a free society."  *M.M. v. Zavaras*, 939 F. Supp. 799, 801 (D. Colo. 1996) (J. Kane).

There is a presumption that documents essential to the judicial process are to be available to the public, but they may be sealed when the public's right of access is outweighed by interests which favor nondisclosure.  *See United States v. McVeigh*, 119 F.3d 806, 811 (10th Cir. 1997). It is within the district court's discretion to determine whether a particular court document should be sealed.  *See Nixon,* 435 U.S at 599.   D.C. Colo. L. Crim. R. 47.1 contemplates that the Court has the authority to seal a document in a case "on motion and an appropriate showing."  A showing of some valid reason for sealing the document is required to ensure public confidence in

the judicial process.  It is critical that the public be able to review the factual basis of this Court's

decisions and evaluate the Court's rationale so that it may be confident that the Court is

functioning as a neutral arbiter.  *Cf. McVeigh*, 119 F.3d at 814.

As noted earlier, the proper functioning of the grand jury process requires secrecy.  This

is reflected in Fed. R. Crim. P. 6(e) which prohibits governmental entities from disclosing grand

jury matters.  However, Rule 6(e) also expressly recognizes circumstances when grand jury

records can be disclosed - for example "in connection with a judicial proceeding," *see* Rule

6(e)(2)(E)(i), and "at the request of a defendant who shows that a ground may exist to dismiss

the indictment because of a matter that occurred before the grand jury," *see* Rule 6(e)(2)(E)(ii).

Both exceptions are applicable to the references in the grand jury transcript which are the

subject of these motions.  Therefore, there is no impediment to disclosure of such references.  In

addition, the public also has an interest in disclosure of these portions of the transcripts in order

to understand the Defendants' allegations, the arguments made and the determination by the

Court.  However, there is no apparent  justification for disclosure of portions of the grand jury

transcripts that are not the subject of the Motions or this ruling, and such portions should remain

secret and under seal.

Unfortunately, the practical application of this distinction is hampered by the manner in

which the documents have been filed.  Some parties have sought to seal their motions and briefs

and all attachments.  Others have sought to seal the entire grand jury transcript, but not the

motions or briefs that refer to it pertinent contents.  The Court is unaware of a redacted version

of the grand jury transcript limited to the excerpts pertinent to the issues presented, that can be

readily and easily unsealed.

Pursuant to Rule 6(e)(2)(E)(i), the motions and briefs of the parties that have been the subject of motions to seal shall be unsealed.  Any transcript of the grand jury proceedings shall remain sealed.  Within 20 days of the date of this order, the Government shall file a redacted transcript of the grand jury proceedings limited to the exchanges that are the subject of the parties' dispute.

**IT IS THEREFORE ORDERED** that

(1)     The Defendants' Motion for Reconsideration **(#721)** regarding consideration of their reply brief is **GRANTED**, in so far as the Court has reconsidered its prior rulings, but **DENIED** in all other respects.

(2)     Defendant Blackburn's Motion to Dismiss Indictment **(#335)**, which Defendants Kaskel **(#336)**, Sharp **(#337)**, Harding **(#338)**, Cain **(#341)**, Travers **(#342)**, Risdon **(#356)**, and Griggs **(#385)** adopted is **DENIED**.

(3)     The Defendants' Joint Motion to Dismiss Indictment Due to Constitutional Errors in Grand Jury Presentation **(#360)** is **DENIED**.

(4)     The motions to seal **(#359, 398, 449, 470, 471, 700, 705, 723, 728, 735)** are **DENIED IN PART** and **GRANTED IN PART**.  All documents at issue **(#360, 360-7, 399, 448, 469, 470, 698, 699, 703, 704, 722, 724, 727, 729, 733, 734)** shall be **UNSEALED**, except for the exhibits containing grand jury transcripts **(360-1, 360-2, 360-3, 360-4, 360-5, 360-6, 399-1, 399-2, 399-3, 448-1, 448-2)**, which shall remain **SEALED**.

(5)    Within 20 days of the date of this order, the Government shall file a redacted transcript of the grand jury proceedings limited to the exchanges that are the subject of the parties' dispute, as discussed in this Order.

Dated this 1st day of December, 2010

BY THE COURT:

_____

Marcia S. Krieger
United States District Judge